# CRIMINAL COMPLAINT

**ORIGINAL**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSEPH SARANELLO | Docket No.<br><br>MAGISTRATE'S CASE NO. **SA10-134M** |

Complaint for violations of Title 18 U.S.C. §§ 371, and 1956(h)

| NAME OF MAGISTRATE JUDGE<br>ARTHUR NAKAZATO | TITLE<br>UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Santa Ana, CA |
|---|---|---|
| DATE OF OFFENSE<br>May 2008, to September 2008 | PLACE OF OFFENSE<br>Orange County | Address of ACCUSED (IF KNOWN) |

**COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION**

*See* attached affidavit which is incorporated as part of this Complaint.

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

MAR 17 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:**

*See* attached affidavit which is incorporated as part of this Complaint.

**MATERIAL WITNESSES IN RELATION TO THIS CHARGE:** Not Applicable.

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>JEFFREY EASTMAN<br>SPECIAL AGENT, IMMIGRATION & CUSTOMS ENFORCEMENT |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE* | DATE<br>March 17, 2010 |
|---|---|

* *See* Rules 3 and 54 of the Federal Rules of Criminal Procedure.

AUSA: CSB

CSB

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Jeffrey Eastman, Special Agent, being duly sworn, hereby depose and say:

I. **Purpose of Affidavit**

1. The purpose of this affidavit is to obtain a warrant to arrest Joseph Saranello ("SARANELLO") for conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

2. This affidavit is submitted for the limited purpose of establishing probable cause sufficient to obtain an arrest warrant for SARANELLO. Based on the facts set forth below, there is probable cause to believe that: (1) SARANELLO established Granite Capital Partners, LLC, a Wyoming LLC, ("GRANITE") for the purpose of purchasing a Lamborghini for Pawel Dynkowski ("DYNKOWSKI"); (2) SARANELLO was also involved with the creation of a Panamanian company called Cordillera Capital ("CORDILLERA"), which received proceeds from an illegal market manipulation scheme involving a company called Rudy Nutrition ("RUNU"); and (3) SARANELLO, under the guise of GRANITE, paid at least $367,800 for DYNKOWSKI's Lamborghini from CORDILLERA's Panamanian bank account via wire to Phillips Auto in Newport Beach.

## II. AGENT BACKGROUND

3. I have been employed as a Special Agent for Immigration and Customs Enforcement ("ICE") since November 2001. I have investigated white-collar crimes since 2001. I am currently assigned to the Orange County Office of ICE and work on strategic investigations, financial investigations, and other violations of law enforced by ICE, including money laundering and related offenses. I have successfully completed U.S. Customs Services ("USCS") Basic Enforcement School at the Federal Law Enforcement Training Center, Glynco, Georgia. In addition, I have participated in advanced training through USCS in financial investigations, asset forfeiture, and smuggling. I have participated in the civil seizure of bank accounts, vehicles, and real properties based on money laundering and structuring offenses.

## III. PROBABLE CAUSE

### A. RUDY NUTRITION MARKET MANIPULATION SCHEME

4. Through my training and experience, I know that a "pump and dump" scheme is a type of market manipulation scheme. In particular, a "pump and dump" scheme can involve touting of a company's stock through false and misleading statements to the investing public. This causes the price of the stock to suddenly rise ("pumping") and then the individuals who have a

large inventory of the shares profit by selling their cheap stock into the buying stock market ("dumping"). A "pump and dump" can also be described as a form of financial fraud that typically involves artificially inflating the price of an otherwise thinly-traded stock (frequently a stock with a small market capitalization traded publicly on the "pink sheets," also known as a "penny stock") to create a level of interest in the stock by unwitting market investors. The price of the stock can be inflated ("the pump") in a number of ways, including:

    a. Through untrue or exaggerated promotional activities (through internet chat rooms, bulletin board postings, e-mail spam, or mailers) - *e.g.*, a press release about the company's financial health or some new product or innovation; and/or

    b. Through cross trading or match trading the stock with others also involved in the scheme (coordinated sales to a known buyer at a known price and vice-versa) so that the stock trading volume increases and it appears as though there is greater market demand than actually exists.

5. The purpose of the "pump" is to prepare the market for the sale of previously acquired stock at an inflated price to unwitting investors. The "dump" occurs when the artificial demand is removed (that is, frequently, when those committing

the fraud sell their shares at the peak price to victim investors and stop hyping the stock), the price of the stock plummets, and many investors who bought the stock at a higher price lose their money.

6. The goal of any market manipulation scheme, such as a "pump and dump" scheme, is to turn otherwise worthless or untradeable stock into cash. Accomplishing this goal does not require a huge jump in price; indeed, my understanding is that because those committing fraud typically obtain the stock they are trading by other fraudulent means and/or for free or close to no money (and therefore have little to no basis in the stock they are trading), they can make large profits by moving a stock's market price just a few pennies or, in some cases, just a fraction of a penny, if they can create and sustain an illusion of market demand.

7. In this case, DYNKOWSKI, SARANELLO, Chad Smanjak ("SMANJAK"), and other known and unknown co-conspirators conspired to pump the price and volume of the stock of Rudy Nutrition ("RUNU"), a beverage company specializing in low-calorie sport drinks, incorporated in the State of Nevada, and to dump RUNU shares on the market at a profit to themselves. Based upon my review of RUNU trading data, between February 2008 and September 12, 2008 (when trading of RUNU stock was halted

the U.S. Securities and Exchange Commission ("SEC")), at least 786 million RUNU shares were issued to participants in this scheme, of which at least approximately 717 million were sold, for a total profit of approximately $7.2 million. In my conversations with the SEC, I know that the SEC has identified CORDILLERA and Falcon Real Estate Holdings ("FALCON") as one of the dump accounts used in the RUNU scheme. Specifically, in July 2008, CORDILLERA was issued a total of approximately 43.9 million RUNU shares, and by August 12, 2008, CORDILLERA sold all of these shares for a profit of approximately $93,000. Furthermore, in May 2008 through July 2008, FALCON was issued a total of approximately 72,622,709 RUNU shares, all of which were sold by August 12, 2008 for a profit of approximately $875,946.68.

8. According to Cooperating Defendant 1 ("CD 1"), who I believe to be credible, in or around April 2008, CD 1 hired DYNKOWSKI and SMANJAK to promote RUNU stock. In other words, CD 1 hired DYNKOWSKI and SMANJAK to create a market in which RUNU shares could be bought and sold, such that co-conspirators could liquidate their RUNU shares by selling large amounts of their shares on the market to unwitting investors. To facilitate this scheme, in Irvine, California, within the Central District of California, CD 1 met with DYNKOWSKI, who was a resident of

Laguna Beach in Orange County, within the Central District of California, and SMANJAK, who was a resident of Long Beach, in Los Angeles County, within the Central District of California.

9. CD 1 agreed to give DYNKOWSKI and SMANJAK millions of free-trading RUNU shares which they could use to cross or match trade among themselves and other accounts in order to create great volume of RUNU shares. Specifically, CD 1 stated that when CD 1 hired SMANJAK and DYNKOWSKI to promote RUNU, SMANJAK asked CD 1 for CD 1's fax number and CD 1 received faxed listing the names of entities which should be issued RUNU stock, including CORDILLERA and FALCON.

10. CD 1 stated that SMANJAK and DYNKOWSKI paid CD 1 from the proceeds of their sale of RUNU stock via wire to CD 1's bank account in the Central District of California from different Panamanian bank accounts. I reviewed CD 1's bank accounts showing that CD 1 received, among others, the following wires for payment on the RUNU scheme to defraud:

    a) June 26, 2008 wire from Cordillera Capital at "Apartado 0834 1308 Panama" to CD 1's bank account in Orange County in the amount of $50,000; and

    b) September 4, 2008 wire from Cordillera Capital at "Apartado 0834 1308 Panama" to CD 1's bank account in Orange County in the amount of $200,000.

11. CD 1 stated that CD 1 earned at least $800,000 from the RUNU scheme. I also know that based on my conversations with the SEC, that accounts believed to be controlled by SMANJAK

and DYNKOWSKI sold at least $6 million worth of RUNU shares on the market. In sum, CD 1 stated that DYNKOWSKI and SMANJAK did an excellent job of promoting RUNU shares.

### B. DYNKOWSKI WAS PAID FOR HIS WORK ON THE RUNU SCHEME WITH THE PURCHASE OF A LAMBORGUINI IN NEWPORT BEACH, CALIFORNIA

12. During the execution of a search warrant on the residence of DYNKOWSKI in or around October 2008 arising from an investigation by the United States Attorney's Office for the District of Delaware, ICE seized a 2007 black Lamborghini, VIN# ZHWBU47S57LA02521, which was parked at DYNKOWSKI's Laguna Beach, California residence. Further investigation of this Lamborghini led SA Eastman to believe that it was paid for with proceeds of the sale of RUNU shares as described more fully below.[1] Within approximately one month after the execution of this search warrant, DYNKOWSKI flew out of the United States and is now a wanted fugitive.

13. On or around June 1, 2009, ICE Intel Analyst Frank Cunningham in the Wilmington, Delaware office informed me that DYNKOWSKI's Lamborghini was purchased with the following two wire transfers to Phillips Auto in Newport Beach: (a) August 4,

---

[1] On April 26, 2009, a federal grand jury issued a second superseding indictment against DYNKOWSKI for conspiracy to commit securities fraud, conspiracy to commit wire fraud, and conspiracy to commit money laundering in United States v. Pawel Dynkowski et al., Crim. Action No. 09-23 (D. Del.).

2008 wire from Panama Capital Partners, S.A. in Edificio Prosperidad, Panama in the amount of $37,300; and

(b) August 15, 2008 wire from Cordillera Capital, Inc., "Apartado 0832-02770" in Planta Baja, Panama in the amount of $367,800.

14. On or around October 24, 2008, I interviewed an employee at Phillips Auto in Newport Beach and gathered documents relating to the lease of DYNKOWSKI's Lamborghini. In particular, Phillips Auto provided SA Eastman with a letter dated August 20, 2008 from "Cecilio Fisher Ayala" ("AYALA"), whom the letter identified as the "Manager" of GRANITE. This letter stated that DYNKOWSKI was authorized to execute all necessary documents in connection with the purchase of the Lamborghini on behalf of GRANITE. Phillips Auto also provided me the identification card of AYALA, which was a Panamanian Driver's License, as well as GRANITE's Articles of Incorporation.

15. CD 1 stated that CD 1 knew that DYNKOWKSI had a Lamborghini, which was leased from a company. CD 1 saw this Lamborghini when DYNKOWSKI lived in Laguna Beach in or around September 2008. CD 1 explained that DYNKOWSKI told CD 1 that DYNKOWSKI leased the Lamborghini back from his own company, and that CD 1 even went with DYNKOWSKI to Phillips Auto in Newport

Beach to pick up the Lamborghini. CD 1 further stated that DYNKOWSKI told CD 1 that DYNKOWSKI had a "Wyoming" company.

### C. SARANELLO CREATED GRANITE

16. Further investigation led me to discover that DYNKOWSKI's Lamborghini was registered to GRANITE on August 28, 2008 to the address: Granite Capital Partners, 2510 Warren Avenue, Cheyenne, Wyoming. Furthermore, I was provided records by WyomingRegisteredAgent.com, stating that SARANELLO created and registered GRANITE on July 28, 2008, and that SARANELLO paid to register GRANITE with the Wyoming Secretary of State and that he paid for this registration with his credit card. These records also reflect that GRANITE's EIN number (or tax identification number) is 26-3123486. The Wyoming registration forms for GRANITE list AYALA as a contact; address of P.O. Box 1596, Silverthorne, Colorado; phone numbers of 281-724-8592 and 720-838-4023; and e-mail address of charlie3333@hushmail.com.

17. In addition to payment by SARANELLO of GRANITE's registration, I discovered that on July 29, 2008, SARANELLO opened a bank account at Wells Fargo under the name GRANITE CAPITAL PARTNERS LLC, 2510 Warren Avenue, Cheyenne, Wyoming, phone number (281)724-8592, which is the same address to which DYNKOWSKI's Lamborghini was registered, and one of the phone

numbers provided on GRANITE's registration forms submitted to Wyoming Secretary of State.

### 1. GRANITE FILES A CLAIM FOR DYNKOWSKI'S LAMBORGHINI SEIZED BY ICE

18. On December 4, 2008, Guillermo Mendoza ("MENDOZA") mailed a letter to Fines Penalties and Forfeiture Division of ICE ("FP&F"), claiming that the Lamborghini ICE seized from DYNKOWSKI was owned by GRANITE; this vehicle was leased to DYNKOWSKI; DYNKOWKSI did not have any ownership rights in this vehicle; and DYNKOWSKI defaulted on his lease. This letter appeared to be signed by MENDOZA and states that MENDOZA is the "Managing Member" of GRANITE. However, because MENDOZA failed to provide supporting documentation, FP&F denied his petition on December 17, 2008. In response, on or around January 8, 2009, MENDOZA appears to have mailed a supplemental petition to FP&F, which I reviewed. This supplemental petition attached a copy of the California title to the Lamborghini, a copy of the lease between GRANITE and DYNKOWSKI, a notice of default, and a copy of the return letter sent via certified mail from GRANITE to DYNKOWSKI. I also reviewed the FedEx Airway bill dated December 8, 2008 showing that the first petition from MENDOZA was sent from 2510 Warren, Cheyenne, Wyoming to FP&F in Long Beach, California.

## 2. EXECUTION OF SEARCH WARRANT ON SARANELLO'S RESIDENCE

19. On March 16, 2010, I executed a warrant to search SARANELLO's residence in Keystone, Colorado, for evidence of violations of 18 U.S.C. § 371 (conspiracy to commit wire fraud), 18 U.S.C. § 1956(a)(1)(b)(i) (money laundering), 18 U.S.C. § 1956(a)(2)(A) (international money laundering), and 26 U.S.C. § 7201 (tax evasion). Among the documents I found in SARANELLO's garage were: (1) an original FedEx airway bill from GRANITE, 2510 Warren, Cheyenne, Wyoming to FP&F in Long Beach, California; (2) the return letter sent via certified mail from GRANITE to DYNKOWSKI with the original certified mail tag posted on the mail; and (3) the California title documents for DYNKOWSKI's Lamborghini. I also found a stock certificate for Rudy Nutrition at SARANELLO's residence. Moreover, I found numerous bank and stock documents bearing MENDOZA's name as well as a colored copy of MENDOZA's Panamanian passport. I also found files for CORDILLERA and GRANITE.

20. During the search, an Internal Revenue Service agent assisting me with the search told me that SARANELLO told him that SARANELLO asked the IRS agent whether SARANELLO could have his driver's license and whether SARANELLO could have his parachute.

21. Furthermore, during the search, SARANELLO's wife told me the following: (a) AYALA had visited Keystone, Colorado and that SARANELLO picked him up at the airport; (b) SARANELLO spoke to an individual named Chad whose last name started with an "S" and she later confirmed that it was "SMANJAK;" and (c) no other Panamanians besides AYALA had visited their home in Keystone but that she had gone to Panama with SARANELLO and was aware that he goes frequently. SARANELLO's wife further advised that they rent their residence, their lease has expired, and that they were looking to move.

3.   **TRAVEL RECORDS**

22. I reviewed the Treasury Enforcement Communications System ("TECS") travel database, which showed that between March 2008 and February 2009, SARANELLO traveled to Panama on at least 6 occasions for only several days at a time (approximately 4-5 days). SARANELLO also traveled to Turks and Caicos from April 27, 2008 to May 3, 2008; St Lucia in October 2009, and Costa Rica in December 2009.

23. Furthermore, during his return from Costa Rica in December 2009, Customs and Border Patrol ("CBP") searched SARANELLO and found several corporate documents stamped by Panamanian notaries in SARANELLO's possession. I reviewed the documents copied by CBP found on SARANELLO's person, which

included forms that appear to be stamped with a Panamanian notary seal and corporate forms for XAX International, which is a company that was issued approximately 68 million RUNU shares, most of which were sold for approximately $815,000. CBP also provided me a document containing what appeared to be SARANELLO's notes on CORDILLERA, XAX International, Synergy Property, Carlton Rowe, Inc., Independent Investors, and Graysia Partners, Inc., which are the same entities that the SEC has identified as names of dump accounts used in the RUNU scheme. CBP also provided me with a spreadsheet in SARANELLO's possession entitled "Chad's Expenses," with a heading "Vendor/Customer," that had over 40 different entries, including, but not limited to, "Panama Res Gov't Fees" with a payment of $11,590; "WY Res Agent Fee"; "Wyoming Registered Agent," with a payment of $300; and "Trip Expenses and Visitor Fees, Wire Fees, WY Rent and Wire Fees." The total list of payments on "Chad Expenses" was $1,703,266.00.

24. CBP also provided me with a Capital Bank account statement for Bluefin Financial Group, Inc. in Panama. SARANELLO had this bank statement on his person when he was traveling back from Costa Rica. On this statement, there are at least 3 payments to S&W Investment Holdings in the total amount of approximately $180,000 between December 2008 to January 2009.

I know based upon my investigation that I reviewed a Bank of America statement of S&W Investment Holdings LLC, account number ending 3101, with an address of "2510 Warren Avenue, Cheyenne, Wyoming." Internal Revenue Service Special Agent Karlous told me that MENDOZA opened this account number ending 3101 on December 17, 2008 at the Ocean Ranch Banking Center in Dana Point, California. The EIN (or tax identification number) was the same EIN number used by SMANJAK to open another S&W Investment Holdings LLC account with Bank of America. I compared that Bluefin Financial Group Capital Bank statement (showing wires to S&W Investment Holdings LLC) with the account statement of S&W Investment Holdings LLC, account number ending 3101 (showing receipt of wires from Bluefin Financial Group), and the three wires match.

25. I also searched TECS for travel by AYALA and MENDOZA. I found that AYALA traveled once to the United States and listed SARANELLO's residence on his I94 card, which is the place where he was going to in the United States. There was no record, however, of MENDOZA traveling to the United States. Notably, I reviewed SARANELLO's Capital One credit card records and saw that SARANELLO had paid for AYALA's trip to the United States.

### D. SAME PANAMANIAN COMPANIES OPENED BROKERAGE ACCOUNTS AT TALLEY & COMPANY BY SMANJAK AND SARANELLO

26. In early 2010, I interviewed Cooperating Defendant 2 ("CD 2"), who I believe to be credible. CD 2 previously worked at Talley and Company (a brokerage firm in Orange County, California) ("Talley"). CD 2 told me that CD 2 opened accounts at Talley for SMANJAK relating to a company called Wave Uranium (Ticker Symbols: "WAVE," "WVUH," or "FBCD"), which is another company I am investigating for securities fraud.[2] CD 2 told me the following: documents necessary for opening new accounts and stock powers were furnished to CD 2 by SMANJAK and an individual identified to CD 2 as "Joe," and SMANJAK provided CD 2 with Joe's contact information including the e-mail address charlie3333@hushmail.com and a phone number of 281-724-8592. I also reviewed Skype records between SARANELLO and SMANJAK showing that SARANELLO communicated with SMANJAK using the phone number 281-724-8592 and e-mail address charlie3333@hushmail.com. CD 2 also told me "Joe" may have been an attorney and resided in Colorado. More importantly, CD 2 told me "Joe" had the Panamanian nominees occasionally call CD 2 to assist in opening the accounts, but that none of the Panamanians ever came into

---

[2] I also spoke to ICE SA Brian Maher, who was told by cooperating defendant 3 ("CD 3") that CD 3 worked on previous deals with SMANJAK, including Wave Uranium.

15

Talley in person. CD 2 stated that all direction to open Panamanian trading accounts at Talley or to sell shares came from SMANJAK and/or "Joe".

27. To further corroborate CD 2's statements, during the execution of the search warrant at SARANELLO's residence, I found an e-mail from SARANELLO to CD 2 that was printed out providing entity names to CD 2. I believe that these entity names were the same names of the Panamanian dump accounts identified by the SEC in the RUNU scheme to defraud.

## IV. CONCLUSION

28. Based on the foregoing, I believe that SARANELLO participated in a conspiracy to commit wire fraud. Namely, there was a scheme to defraud, which was a market manipulation scheme perpetuated by CD 1, SMANJAK, DYNKOWSKI, SARANELLO, and other known and unknown conspirators, involving the pumping and dumping of Rudy Nutrition ("RUNU") stock. SARANELLO created, or assisted in the creation, of Panamanian entities that were issued millions of RUNU shares, all of which were sold on the market, for a profit of at least $6 million. Specifically, SARANELLO created CORDILLERA, which was issued approximately 43.9 million RUNU shares in July 2008, all of which were sold by August 12, 2008; and on August 15, 2008, CORDILLERA wired $367,800 from Panama to Phillips Auto in Newport Beach,

California for the benefit of DYNKOWSKI. The money from the CORDILLERA account contained illegal proceeds from the sale of RUNU stock by DYNKOWSKI and SMANJAK. Therefore, SARANELLO participated in a conspiracy to launder at least $367,800 to enable DYNKOWSKI to reap the benefits of the RUNU scheme to defraud. Throughout this conspiracy, SARANELLO used interstate wires in many ways, including, but not limited to, paying for the registration of GRANITE via credit card; paying for AYALA's trip to the United States from Panama via credit card; using Skype to communicate with co-conspirator SMANJAK; and orchestrating CORDILLERA to pay CD 1 $250,000 from CORDILLERA's account in Panama.

29. Based upon the facts set forth in this affidavit, I believe that there is probable cause to believe that SARANELLO violated 18 U.S.C. § 371 (conspiracy to commit wire fraud), and 18 U.S.C. § 1956(h) (conspiracy to commit money laundering).

---
Jeffrey Eastman
Special Agent
Immigration and Customs Enforcement

Sworn to and subscribed before me
on this 17th day of March, 2010

---
HONORABLE ARTHUR NAKAZATO
United States Magistrate Judge